UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| United States of America | Criminal No. 3:06cr160 (JBA) |
| *v.* | |
| Azibo Aquart and Azibo Aquart | October 26, 2010 |

RULING ON MOTIONS TO DISMISS THE INDICTMENT AND TO DISMISS THE
NOTICES TO SEEK THE DEATH PENALTY

Defendants Azikiwe Aquart ("Azikiwe") and Azibo Aquart ("Azibo") have been

indicted for conspiracy to commit murder in aid of racketeering, drug–related murder, and

conspiracy to possess with intent to distribute 50 grams or more of cocaine base.  The

Government has filed a Notice of Intent to seek the death penalty ("NOI") as to both

Defendants. Both Defendants now move to dismiss the Superseding Indictment

[Doc. ## 320, 323] and move to dismiss the Government's NOI [Doc. ## 328, 329].

I.      Motions to Dismiss the Indictment

Azibo and Azikiwe move to dismiss the Fourth Superseding Indictment (the

"Indictment")[1] on the basis that it fails to demonstrate "that the grand jury in this case

determined that there was probable cause to believe that the aggravating factors sufficiently

outweighed the mitigating factors, or that the circumstances were such as to justify a sentence

of death." (Azibo Mem. Supp. at 1.)  Specifically, Defendants argue that the Government

presented the Grand Jury with the aggravating factors for each defendant "without explaining

---

[1] Defendants' motions are directed at the Third Superseding Indictment [Doc. # 255]
The Government has since filed a Fourth Superseding Indictment [Doc. # 361]; there is no
material difference for purpose of Defendants' motions, and the Court will therefore refer
to the "Indictment" as the operative Fourth Superseding Indictment.

that findings on such factors mean that the grand jury is charging the defendant with a capital crime." (*Id.* at 6.)  They argue that the grand jury could not have "perform[ed] a meaningful 'gatekeeping' function without understanding the nature and significance of the allegations the Government seeks to include in the [I]ndictment, and for whom it has decided to send through the gate." (*Id.*)  Further, Defendants contend that "[b]y failing to allege the defendant's eligibility for death in the indictment, the Government would deprive the grand jury of the "*most significant* [discretionary function] *of all*," deciding whether to charge "*a capital offense or a noncapital offense.*" (*Id.* at 6 (citing *Vasquez v. Hillery*, 474 U.S. 254, 263 (1986) (emphasis in Azibo Mem. Supp.)).)

The Second Circuit requires that "the Government . . . charge statutory aggravating factors under the [Federal Death Penalty Act ("FDPA")] in the indictment." *United States v. Fell*, 531 F.3d 197, 237 (2d Cir. 2008).  It is undisputed that the grand jury in this case determined there to be probable cause to charge the substantive offenses for which the Government seeks the death penalty, as well as the eligibility factors, which are set forth in the Indictment.  Thus, the Government has complied with the requirements of *Fell*. Defendants nonetheless contend that the Indictment is deficient because the Government did not inform the grand jury that Defendants faced the death penalty if they included the eligibility facts in the Indictment they returned.

The role of grand juries is "to investigate possible crimes . . . so that it can make a judgment whether a trial on specific charges is necessary." *United States v. Suleiman*, 208

2

F.3d 32, 39 (2d Cir. 2000). To serve this function and to return an indictment upon finding probable cause, a grand jury need not consider potential sentences. *See, e.g.*, *United States v. Haynes*, 269 F. Supp. 2d 970, 981 (W.D. Tenn. 2003) (rejecting defendant's argument that the grand jury could not properly fulfill its role as a check on prosecutorial power unless it was made aware that its special findings might make the defendant eligible for the death penalty because "[t]he grand jury's role is not to decide whether probable cause supports the imposition of a particular *sentence* against a charged individual; rather the grand jury check on prosecutorial power stems from its independent *factual* determination of the existence of probable cause for the essential elements of the charged offense" (emphasis in original)); *United States v. Lecco*, No. 2:05-00107-02, 2007 WL 1074775, at *3 (S. D. W.Va. Apr. 5, 2007) ("[T]he Supreme Court has made clear that the Indictment Clause of the Fifth Amendment does not require the government to inform the grand jury of the potential penalties that might attach as a result of any special findings.") (citing *Branzburg v. Hayes*, 408 U.S. 665, 686–87 (1973)); *United States v. Matthews*, 246 F. Supp. 2d 137, 147 (N.D.N.Y. 2002) ("[G]rand juries do not make findings or recommendations concerning punishment or sentencing and such considerations should not influence their decision."). Because the Grand Jury was able to fulfill its constitutional role in determining whether there was probable cause to charge Azibo and Azikiwe for the crimes in the Indictment without considering potential sentences, the Indictment is not deficient even if the Grand Jury was not informed Defendants could face the death penalty as a result.

3

Defendants also argue that the Indictment is constitutionally deficient because the Government did not present evidence of mitigating factors to the Grand Jury. While the Second Circuit has not addressed the question of whether mitigating evidence must be provided to a grand jury, the Eighth and Ninth Circuits have both determined that the Government has no such obligation. In *United States v. Purkey*, the Eighth Circuit explained that while an indictment must charge at least one statutory aggravating factor, it need not allege "*all* of the factors that might be weighed by the jury deciding whether to impose a death sentence." 428 F.3d 738, 749 (8th Cir. 2005) (citing *United States v. Higgs*, 353 F.3d 281, 299 (4th Cir. 2003), *cert. denied* 543 U.S. 1004 (2004)) (emphasis in *Purkey*). The court further explained that for an indictment, "it makes no sense to speak of the weighing process mandated by [the FDPA,] 18 U.S.C. § 3593(e)—that is, the lens through which the jury must focus the facts that it has found to produce an individualized determination regarding 'whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence.'" *Id.* at 750. The Ninth Circuit explained in dicta in *United States v. Mitchell* why the Fifth Amendment does not require that a grand jury weigh aggravating and mitigating factors: "the grand jury has no way of knowing what mitigating factors the defendant will urge." 502 F.3d 931, 993–94 (9th Cir. 2007).

In the absence of any indication that the Second Circuit would part company with the rationale or results in *Purkey* or *Mitchell*, this Court concludes that the Government fulfilled its obligation to include in the Indictment statutory aggravating factors, and it was not

required to either notify the grand jury that it may seek the death penalty or to present evidence of mitigating factors. Therefore, the Indictment is not constitutionally deficient, and Defendants' motions to dismiss the Indictment are denied.

II.     Motions to Dismiss Notice of Intent to Seek the Death Penalty

Azikiwe and Azibo also move to dismiss the Government's NOI on the basis that the FDPA is unconstitutional on its face. Defendants make the following arguments, each of which is addressed in turn below: (1) the FDPA operates in an unconstitutionally arbitrary and capricious manner; (2) the FDPA is sought and imposed on the basis of race and geography; (3) the NOI does not conform to the requirements of *Ring v. Arizona*, 536 U.S. 584 (2002), that non–statutory aggravators be alleged in the indictment; (4) the FDPA is unconstitutional because it does not require the jury to find that aggravating factors outweigh mitigating factors beyond a reasonable doubt; and (5) the FDPA may lead to the execution of innocent persons.

A.     Arbitrary and Capricious

Defendants first argue that under FDPA, the death penalty is imposed in an arbitrary and capricious manner in violation of the Eighth Amendment. They note that the Government rarely seeks to impose the death penalty and that "no principled distinction can be drawn between the cases in which the death penalty is imposed and those in which it is not." (Azikiwe Mem. Supp. at 3.) Defendants emphasize both that the Government seeks the death penalty in fewer than 20 percent of cases in which a defendant is eligible for the death penalty and that fewer than 20 percent of defendants in these cases receive the death penalty. (*Id.* at 4.) Thus, according to Defendants, the Government does not seek, and juries do not

impose, the death penalty in a consistent or predictable manner; rather, "[b]eing sentenced to death in the federal system is truly akin to being struck by lightning." (*Id.* at 3, 5.)

Defendants rely primarily on *Furman v. Georgia*, 408 U.S. 238 (1972), in which the Supreme Court held that in the absence of necessary sentencing guidance, the imposition of the death penalty under Georgia and Texas statutes constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. In his concurrence, Justice White explained that "the death penalty is exacted with great infrequency even for the most atrocious crimes and . . . there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not. *Id.* at 313 (White, J., concurring). Later, in *Gregg v. Georgia*, 428 U.S. 153, 195 (1976), the Supreme Court clarified that "the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." A statute that avoids the arbitrariness of the Georgia and Texas statutes declared unconstitutional in *Furman* is one said to afford sentencing discretion that is "suitably directed and limited." *Id.* at 189.

The FDPA by its terms directs and limits both the prosecutors' discretion to seek the death penalty and the jurors' discretion to impose it. *See* 18 U.S.C. § 3591. Additionally, the decision to seek the death penalty under the FDPA is centralized in the hands of the Attorney General in coordination with the Department of Justice Capital Review Committee, and they follow delineated procedures. *See* United States Attorney's Manual 9–10.130(D) ("[T]he United States Attorney, the Capital Review Committee, and the Attorney General will determine whether the applicable statutory aggravating factors and any non–statutory aggravating factors sufficiently outweigh the applicable mitigating factors to justify a sentence

of death.  Reviews are to resolve ambiguity as to the presence or strength of aggravating or mitigating factors in favor of the defendant.  The analysis employed in weighing the aggravating and mitigating factors should be qualitative, not quantitative: a sufficiently strong aggravating factor may outweigh several mitigating factors, and a sufficiently strong mitigating factor may outweigh several aggravating factors. Reviewers may accord weak aggravating or mitigating factors little or no weight. Finally, there must be substantial, admissible, and reliable evidence of the aggravating factors."). The fact that the death penalty is sought in relatively few death–eligible cases does not necessarily mean that federal prosecutors act arbitrarily and capriciously in seeking it; rather, the limited number of death–penalty cases could result from prosecutors concluding in most cases that the mitigating factors outweigh aggravating factors.  *See, e.g.*, *United States v. Sampson*, 275 F. Supp. 2d 49, 88 (D. Mass 2003) ("[T]he mere fact that the federal death penalty is often not sought and is more rarely imposed does not render it unconstitutional.");  *United States v. Hammer,* 25 F. Supp. 2d 518, 546–47 (M.D. Pa. 1998) ("The mere fact that the government has sought the death penalty in a de minimus number of murder cases involving federal inmates is not sufficient to demonstrate that the prosecution of [the defendant] is arbitrary and capricious.  More is required.  [The defendant] must show that the government is seeking the death penalty for an impermissible reason, such as race, religion, or in retaliation for exercising his right  to trial by jury.").

With respect to Defendants' contention that juries arbitrarily impose the death penalty, evidenced by the low percentage of death penalty verdicts and *Furman*'s analysis of Texas and Georgia death–penalty statutes in the early 1970s, the FDPA reflects an effort to provide the type of standards and guidance to the jury that the Supreme Court required. In

7

*Gregg*, the Supreme Court explained that "[j]ury sentencing has been considered desirable in capital cases," and "a bifurcated procedure one in which the question of sentence is not considered until the determination of guilt has been made is the best answer." *Gregg*, 428 U.S. at 190–91. The FDPA requires such bifurcated jury trials. *Gregg* also explained that the problem that "members of a jury will have had little, if any, previous experience in sentencing [and are] unlikely to be skilled in dealing with the information they are given," requires that "the jury [be] given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision," *id.* at 192, and that "[w]here the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner," *id.* at 195.

The FDPA sets out safeguards, standards, and guidance. During the penalty–phase under the FDPA, the jury weighs evidence of statutory and non–statutory aggravating and mitigating factors. *See* 18 U.S.C. §§ 3591–3593. The jury must also return "special findings identifying" aggravating and mitigating factors, and "[a] finding with respect to any aggravating factor must be unanimous." 18 U.S.C. § 3593(d). The court must instruct the jury that it is prohibited from considering the race, color, religious beliefs, national origin or sex of the defendant or any victim in determining whether the death penalty is appropriate, and each juror must certify to the court in writing that he or she did not take any of these factors into account when deciding the appropriate penalty. 18 U.S.C. § 3593(f). Because the Government may only seek the death penalty under the FDPA for limited crimes, and because properly–instructed juries must weigh delineated aggravating and mitigating factors

8

and report their findings, the FDPA avoids the Eighth and Fourteenth Amendment violations faced in *Furman*.

      B.     Geography and Race

Defendants also argue that the FDPA is unconstitutional because the federal death penalty is disproportionately sought against minority defendants and in certain geographic regions. Defendants cite statistics that they argue indicate that the death penalty has been disproportionately sought and imposed against non–white defendants and in the South. Defendants, however, do not argue that their race or the geographic location of this prosecution were considerations in deciding to seek the death penalty against them.

This generalized statistical disparity, without evidence of its applicability to these Defendants was foreclosed by the Supreme Court in *McClesky v. Kemp*, 481 U.S. 279 (1987). There, the black defendant who was convicted and sentenced to death for killing a white police officer, argued that Georgia's imposition of the death penalty violated the Fourteenth Amendment's Equal Protection clause because it discriminated against black defendants and in favor of white victims. The defendant based his claim not on evidence of discrimination in his case but on a statistical study showing that black defendants were 1.1 times as likely to receive a death sentence as white defendants and that the death penalty was sought with greater frequency for black defendants who were charged with killing white victims than for white defendants charged with killing white victims. The Supreme Court held that reliance only on a statistical study showing a death–penalty disparity based on the defendant's and the victim's race was insufficient to demonstrate discriminatory intent in a particular defendant's case. To prevail on his Equal Protection claim, the defendant was required to "prove that the decision makers in *his* case acted with discriminatory purpose." *Id.* at 293 (emphasis in

original); *see also United States v. Armstrong*, 517 U.S. 456, 465 (1996) ("The requirements for a selective–prosecution claim draw on 'ordinary equal protection standards.' . . . The claimant must demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose."); *United States v. Bin Laden*, 126 F. Supp. 2d 256, 260–61 (S.D.N.Y. 2000) (rejecting arguments of defendants charged with United States embassy bombings in East Africa that the federal death penalty is sought on the impermissible bases of race and geography—relying on the same statistics as Defendants here—because *McCleskey* requires proof of individualized prosecutorial discriminatory intent, and generalized statistics were insufficient). Here, as well, Defendants have not proffered any evidence that racial or regional bias played in a role in the Government's decision to seek the death penalty for the capital crimes with which Defendants are charged, and therefore, their challenge to the constitutionality of the FDPA on this basis fails.

C.    Non–statutory aggravating factors

1.    *Presentment to the Grand Jury and Inclusion in the Indictment*

Defendants next argue that the FDPA violates the Fifth and Sixth Amendments after *Ring v. Arizona*, 536 U.S. 584 (2002), because the FDPA does not require that non–statutory aggravating factors be presented to a grand jury and included in an indictment. Non–statutory aggravating factors are not enumerated in the FDPA, but are defined as "any other aggravating factor for which notice has been given." 18 U.S.C. § 3592(c). In *Ring*, the Supreme Court held that under the Sixth Amendment, an aggravating factor rendering a defendant death–eligible "operate[s] as the functional equivalent of an element of a greater offense," and therefore must be found by a jury, building on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which emphasized that "[i]f a State makes an increase in a defendant's authorized

punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602. Thereafter, courts have recognized that statutory aggravators must be alleged in the indictment to satisfy the Indictment Clause of the Fifth Amendment. *See, e.g.*, *Brown v. United States*, 441 F.3d 1330, 1367 (11th Cir. 2006) (collecting cases), *cert. denied* 549 U.S. 1182 (2007).

Although *Ring* was silent as to whether the Government must present non–statutory aggravating factors to a grand jury and include those factors in an indictment, Defendants argue the combined import of *Apprendi* and *Ring is* that the Government must include *all* aggravating factors in the Indictment. In arguing that the Constitution requires the Government to present non–statutory aggravators to a grand jury, Defendants rely in large part on *Cunningham v. California*, 549 U.S. 270 (2007) , which reiterated the *Apprendi* brightline rule that "[e]xcept for a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 288–89. *Cunningham* concluded that California's Determinate Sentencing Law ("DSL") violated the Sixth Amendment insofar as it made a defendant's exposure to a sentence beyond the maximum contingent on a judge's finding, by a preponderance of the evidence, that an aggravating factor existed. The Contra Costa County Superior Court judge sentencing Cunningham was authorized under the DSL to impose a maximum sentence of 12 years "unless he found facts allowing the imposition of a sentence of 6 to 16 years." *Id.* The Supreme Court determined that because the relevant statutory maximum for Cunningham's offense was 12 years but the DSL authorized a sentence beyond that maximum based on judicial factual findings, it violated the Sixth Amendment.

Defendants contend that the FDPA mirrors the DSL and therefore is also unconstitutional. However, the Second Circuit in *Fell* determined there to be a clear distinction between the two statutory schemes, such that *Cunningham*, interpreting *Ring* and *Apprendi*, does not compel the conclusion that the Constitution mandates that non–statutory aggravating factors be presented to a grand jury under the FDPA. 531 F.3d at 238. In holding that the Government was not required to present to the grand jury the non–aggravating factors it included in its Notice of Intent to seek the death penalty for appellant Donald Fell, the Second Circuit explained that not only did the jury find both the statutory and non–statutory aggravating factors beyond a reasonable doubt, but additionally,

> the FDPA requires only that the jury sentencing Fell find mental culpability and at least one statutory aggravator, both charged in the superseding indictment, before finding him 'eligible' for the death penalty. *See* 18 U.S.C. § 3593(e). Whether or not Fell *should* be sentenced to death was a calculation made by the jury based on a variety of statutory and non–statutory considerations. Accordingly, the factors that Fell's jury assessed when determining the permissibility of the death penalty in his case did not change the maximum sentence authorized under the statute.

*Id*; *see also, e.g.*, *United States v. Higgs*, 353 F.3d 281, 298 (4th Cir. 2003) ("The finding of a nonstatutory aggravator alone will not support imposition of the death penalty. Rather, the purpose of nonstatutory aggravators is to aid the factfinder in selecting the appropriate sentence from the available options, *i.e.*, death or life imprisonment."); *United States v. Purkey*, 428 F.3d 738, 749 (8th Cir. 2005) (non–statutory aggravators "are neither sufficient nor necessary under the FDPA for a sentence of death").

As the Second Circuit made clear, the FDPA provides that a jury first determine whether a defendant is death–eligible, a determination based on finding beyond a reasonable doubt of the existence of the required *mens rea* and a *statutory* aggravator, both of which

must be presented to a grand jury and included in an indictment. Only after determining that a defendant is death–eligible does a jury look to non–statutory factors in assessing whether it should impose the death penalty. Thus, as the Second Circuit explained, the FDPA does not run afoul of the rule in *Apprendi*, *Ring*, and *Cunningham* because non–statutory aggravating factors do not increase the penalty beyond the prescribed statutory maximum. Because non–statutory aggravating factors do not expose a defendant to a greater sentence than could otherwise be imposed under the FDPA, *Ring* does not require that they be presented to the grand jury and included in the indictment.

### 2.    Admissibility of Victim Impact and Uncharged Conduct

Defendants next argue that the FDPA violates the Fifth and Sixth Amendments by requiring juries to consider evidence of non–statutory aggravators, specifically, victim–impact and uncharged–conduct evidence, which they contend is "irrelevant and unfairly prejudicial to a verdict of guilty for capital murder."[2] (Azikiwe Mem. Supp. at 31.)

_____

[2] The non–statutory factors listed in the Government's Notice of Intent to Seek the Death Penalty as to Azibo are:

1.    Other Specific Acts of Violence. The defendant committed criminal acts of violence that posed a serious threat to the lives and safety of persons other than the victims in this case. The defendant engaged in a continuing pattern of violent criminal conduct, including but not limited to, the following: threats of violence towards others; the brandishing of firearms; and, the physical beating of others.

2.    Victim Impact Evidence. As reflected by the victims' personal characteristics as individual human beings and the impact of the offenses on the victims and their families, the defendant caused loss, injury, and harm to the victims and their families, see *Payne v. Tennessee*, 501 U.S. 808, 825–827 (1991), including, but not limited to, the following:

However, the Supreme Court explained in *Barclay v. Florida* that

[a]lthough a death sentence may not rest *solely* on a nonstatutory aggravating factor, the Constitution does not prohibit consideration at the sentencing

---

      (a)    Characteristics of victim. The defendant caused the death of the victim(s) who enjoyed a strong relationship with their families, including their parents, their siblings, and their children and grandchildren.

      (b)    Impact of the offenses on the family of the victim. The victims' families have suffered severe and irreparable harm. The victim, Tina Johnson [Count Two], provided financial and emotional support to her entire family. The two other victims, James Reid [Count Three] and Basil Williams [Count Four], provided emotional support to their families.

(Notice of Intent to Seek the Death Penalty Azibo [Doc. # 228].) The non–statutory factors listed in the Government's Notice of Intent to Seek the death Penalty as to Azikiwe is:

    1.    Victim Impact Evidence.  As reflected by the victims' personal characteristics as individual human beings and the impact of the offense on the victims and their families, the defendant caused loss, injury, and harm to the victims and their families, *see Payne v. Tennessee*, 501 U.S. 808, 825–827 (1991), including, but not limited to, the following:

      (a)    Characteristics of victim.  The defendant caused the death of the victim(s) who enjoyed a strong relationship with their families, including their parents, their siblings, and their children and grandchildren.

      (b)    Impact of the offenses on the family of the victim. The victims' families have suffered severe and irreparable harm. The victim, Tina Johnson [Count Two], provided financial and emotional support to her entire family. The two other victims, James Reid [Count Three] and Basil Williams [Count Four], provided emotional support to their families.

(Notice of Intent to Seek the Death Penalty Azikiwe [Doc. # 229].)

14

> phase of information directly related to either statutory aggravating or
> statutory mitigating factors, as long as that information is relevant to the
> character of the defendant or the circumstances of the crime.

463 U.S. 939, 966–67 (1983) (internal citations omitted, emphasis in original).   When

non–statutory aggravators are relevant to the character of the defendant (uncharged conduct)

or the circumstances of the crime (victim impact), they are said to aid the jury in making an

individualized sentencing determination.  "[T]he Constitution does not require the jury to

ignore other possible aggravating factors in the process of selecting, from among [the class

of eligible defendants narrowed by statutory aggravating factors] those defendants who will

actually be sentenced to death . . . [w]hat is important at the selection stage is an

individualized determination on the basis of the character of the individual and the

circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 878–79 (1983); *see also United*

*States v. Cooper*, 91 F. Supp. 2d 90, 100 (D. D.C. 2000) (the FDPA's provision that juries may

consider non–statutory aggravators is not unconstitutional because those aggravators allow

the jury to make an individualized determination at the sentencing phase and because the

Government does not have unbridled discretion in devising non–statutory aggravating

factors).

Additionally, the Supreme Court has held that the non–statutory aggravators the

Government seeks to introduce under the FDPA in this case, are not *per se* unconstitutional.

In *Payne v. Tennessee*, the Supreme Court held that victim–impact evidence at the sentencing

phase is not unconstitutional because it advances the prosecution's  "legitimate interest in

counteracting mitigating evidence which the defendant is entitled to put in, by reminding the

sentencer that just as the murderer should be considered as an individual, so too the victim

is an individual whose death represents a unique loss to society and in particular to his

family." 501 U.S. 808, 825 (1991). The Supreme Court in *Tuilaepa v. California* also rejected a challenge to the constitutionality of a California statute that allows juries to consider prior violent acts as a non–statutory aggravator, because where relevant, circumstances of a crime and whether a defendant may constitute a continuing threat to society are traditional subjects for consideration by the sentencer. 512 U.S. 967, 976–77 (1994); *see also*, *e.g.*, *Eaton v. Angelone*, 139 F.3d 990, 998 (4th Cir, 1998) ("Courts have routinely considered evidence of prior unadjudicated acts in assessing future dangerousness."); *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), *abrogated on other grounds by United States v. Martinez–Salazar*, 528 U.S. 304, 310–11 (2000) (prior unadjudicated offenses as non–statutory aggravators are not *per se* inadmissible on constitutional grounds). Courts have allowed juries to consider evidence of prior uncharged criminal conduct as a non–aggravating factor where such conduct is relevant to the murders charged. For instance, in *United States v. Gilbert*, the defendant's motion to strike nonstatutory aggravating factors was denied in part, as to evidence that the defendant tried to murder her husband by lethal injection around the time the charged murders were alleged to have been committed, because that conduct was of sufficient gravity and close enough temporally to possibly have relevance in the penalty phase. 120 F. Supp. 2d 147 (D. Mass. 2000).[3] The district court recognized that the "overwhelming majority of federal courts has held that neither the Eighth Amendment nor the due process clauses

---

[3] In *Gilbert*, other evidence of prior violent conduct, such as evidence that the defendant scalded a young boy she cared for as a nurse with hot water eight years before the crimes charged, could not be presented to the jury as a non–statutory aggravator, because "[w]hile of course disturbing, this allegation is simply of insufficient gravity to be relevant to whether the defendant here should live or die" because there was no evidence that the scalding resulted in severe injury to the boy, any testimony about the incident thirteen years after the fact would not be reliable enough to be used in capital sentencing, no charges were brought, and there were no witnesses. *Id.* at 153.

impose a *per se* barrier to the use of unadjudicated criminal conduct in capital sentencing" and "evidence of other acts of violence by a defendant is arguably more relevant and probative than any other type of aggravating evidence supporting imposition of the death penalty." *Id.* at 151–52.

Because non–statutory aggravators are not *per se* unconstitutional, victim–impact and uncharged–conduct evidence may be relevant in death–penalty sentencing trials, and in the absence of any Second Circuit authority to the contrary, the FDPA's provision allowing juries to consider non–statutory aggravators does not render it unconstitutional.

E.    Burden of Proof in Balancing Aggravating and Mitigating Factors

Defendants also contend that the "selection phase" of a jury's sentencing determination under the FDPA—the weighing of mitigating and aggravating factors pursuant to 18 U.S.C. § 3593(e)[4] after determining that a defendant is death–eligible—is unconstitutional, because the jury need only determine that the aggravators outweigh the mitigators by a preponderance of the evidence. Defendants rely on the rule in *Apprendi* that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 490. They point to the Supreme Court's definition in *Blakeley v. Washington*, 542 U.S. 296, 303 (2004) of the term "statutory maximum" as "the maximum

---

[4] 18 U.S.C. § 3593(e) provides that if the jury determines the defendant to be death–eligible, it shall consider "whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death. Based upon this consideration, the jury by unanimous vote, or if there is no jury, the court, shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence."

sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Additionally, "when a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment, and the judge exceeds his proper authority." *Id.* (internal citations omitted). Defendants maintain that because the FDPA requires that the jury determine whether aggravators outweigh mitigators in deciding whether to impose the death penalty, and because that determination is not required to be made beyond a reasonable doubt, the FDPA does not comply with the *Apprendi* rule.

Defendants' argument misconstrues the nature of the "selection process." As discussed above, under the FDPA a jury determines beyond a reasonable doubt as a threshold issue whether a capital defendant is death–eligible, i.e. whether the Government has proved at least one of the statutory aggravators alleged in the Indictment, and thus, under the FDPA, the jury does in fact determine beyond a reasonable doubt whether the "maximum sentence" is the death penalty. The weighing of mitigating and aggravating factors, which takes place after only after that determination "constitutes a process, not a fact to be found." *See United States v. Sampson*, 486 F.3d 13, 32 (1st Cir. 2007) (rejecting the argument that the weighing is a fact); *see also Purkey*, 428 F.3d at 750 (characterizing the weighing process as "the lens through which the jury must focus the facts that it has found). In the absence of any Second Circuit authority on the FDPA intimating an outcome contrary to *Sampson*,[5] the Court is unpersuaded that *Apprendi* requires the result Defendants urge. Because the jury in an FDPA

---

[5] Defendants cite *Johnson v. State*, 118 Nev. 787 (2002), *State v. Whitfield*, 107 S. W. 3d 253 (Mo. 2003), and *Woldt v. People*, 64 P.3d 256 (Colo. 2003), which analyze Nevada, Missouri, and Colorado death–penalty statutes respectively, each requiring a finding of the absence of mitigating factors beyond a reasonable doubt as the second step in sentencing.

sentencing–phase trial determines beyond a reasonable doubt whether facts exist such that the death penalty may be imposed, and only then undergoes the aggravator/mitigator weighing–process set forth in 18 U.S.C. § 3593(e), the FDPA complies with the Sixth Amendment as interpreted by the Supreme Court in *Apprendi* and *Blakeley*.

F.    Potential Execution of Innocent Persons

Finally, Defendants argue that the FDPA is unconstitutional because its continued use will lead to the execution of innocent persons, echoing the district court decision in *United States v. Quinones*, 205 F. Supp. 2d 256 (S.D.N.Y. 2002) ("*Quinones I*") that by creating a significant risk of executing the innocent, the FDPA violates the Due Process Clause of the Fifth Amendment.  However, as Defendants recognize, the Second Circuit reversed the district court in *United States v. Quinones*, 313 F.3d 49 (2d Cir. 2003) ("*Quinones II*"), on the basis that

> the argument that innocent people may be executed—in small or large numbers—is not new; it has been central to the centuries–old debate over both the wisdom and the constitutionality of capital punishment, and binding precedents of the Supreme Court prevent us from finding capital punishment unconstitutional based solely on a statistical or theoretical possibility that a defendant might be innocent.

*Id. at 63.*  This Court is bound by the Second Circuit's *Quinones II* decision and thus rejects Defendants' argument.

19

III.    Conclusion

Accordingly, Azibo's Motion to Dismiss the Superseding Indictment [Doc. # 320], Azikiwe's Motion to Dimiss the Third Superseding Indictment [Doc. # 323], Azikiwe's Motion to Dismiss the Government's Notice of Intent to Seek the Death Penalty [Doc. # 328], and Azibo's Motion to Dismiss Death Penalty Notice [Doc. # 329] are DENIED.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 26th day of October, 2010.